960 So.2d 988 (2007)
Laverne PENA and Frank Pena
v.
DELCHAMPS, INC.
No. 2006 CA 0364.
Court of Appeal of Louisiana, First Circuit.
March 28, 2007.
Writ Denied June 22, 2007.
*990 Robert L. Henderson, Jr., Slidell, Counsel for Plaintiffs/Appellees/Cross Appellants Laverne Pena and Frank Pena.
Paul A. Eckert, New Orleans, Counsel for Defendants/Appellants Delchamps, Inc. and National Union Fire Insurance Co. of Pittsburgh, PA.
Before: CARTER, C.J., KUHN, GAIDRY, HUGHES and WELCH, JJ.
GAIDRY, J.
The defendants-appellants, Delchamps, Inc. (Delchamps) and its insurer, National Union Fire Insurance Company of Pittsburgh, PA,[1] appeal the trial court's judgment rendered in accordance with a jury's verdict awarding the plaintiff-appellee, Laverne Pena, the total amount of $620,000.00 for personal injury damages. Mrs. Pena and her husband have answered the appeal, seeking modification of the damages awards. For the following reasons, we affirm in part, reverse in part, and affirm.

FACTS AND PROCEDURAL BACKGROUND
On May 26, 1998, while shopping at a Delchamps grocery store in Slidell, Laverne Pena fell to the floor in front of the meat case. She sustained an injury to her right knee. Mrs. Pena was unable to walk and had to use an electric wheelchair to leave the store. As she departed, she was accompanied by a Delchamps employee, who told her that he had just mopped the floor where she fell. According to Mrs. Pena, there were no warning signs or cones set up indicating that the floor was wet. She did not recall seeing any mops or buckets in the area at the time of her fall. Mrs. Pena sought medical care and underwent a series of surgical procedures, eventually undergoing a total knee replacement.
On May 21, 1999, Mrs. Pena and her husband Frank filed this lawsuit, naming Delchamps and its insurer as defendants. After a jury trial, judgment was rendered in conformity with the jury's verdict, awarding Mrs. Pena $420,000 in special damages and $200,000 in general damages.
Defendants suspensively appeal, assigning as error the jury's conclusions that Delchamps was negligent and that Mrs. Pena was not comparatively at fault, and *991 the awards of general and special damages as abusively high. The Penas' answer challenges the award of general damages to Mrs. Pena, suggesting it was abusively low, as well as the jury's failure to award loss of consortium damages to Mr. Pena.

LIABILITY OF DELCHAMPS
Louisiana Revised Statutes 9:2800.6 sets forth the burden of proof applicable to the claims at issue, providing in part:
A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.
B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.
Thus, merchants are required to exercise reasonable care to protect those who enter the store, and this duty extends to keeping the premises safe from unreasonable risks of harm and warning persons of known dangers. Leonard v. Wal-Mart Stores, Inc., 97-2154, p. 4 (La. App. 1st Cir.11/6/98), 721 So.2d 1059, 1061. But merchants are not insurers of their patrons' safety, and a customer is under a duty to use ordinary care to avoid injury. Cusimano v. Wal-Mart Stores, Inc., 04-0248 (La.App. 1st Cir.2/11/05), 906 So.2d 484. A merchant is not liable every time an accident happens. Leonard, 97-2154 at p. 3, 721 So.2d at 1061.
A hazardous condition is one that creates an unreasonable risk of harm to customers under the circumstances. In the context of slip-and-fall cases, a hazard is shown to exist when the fall results from an unreasonably slippery condition. Stockwell v. Great Atlantic & Pacific Tea Company, 583 So.2d 1186, 1188 (La.App. 1st Cir.1991).
The question of whether or not a condition presents an unreasonable risk of harm is subject to review under the manifest error standard. Thus, we must uphold the trial court's determination if we are convinced, from a review of the entirety of the record, that it has a reasonable factual basis. See Reed v. Wal-Mart Stores, Inc., 97-1174, pp. 4-5 (La.3/4/98), 708 So.2d 362, 364-65. Where there are two permissible views of the evidence, the factfinder's choice cannot be manifestly erroneous or clearly wrong. Stobart v. State, Through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La.1993).
On appeal, defendants contend that plaintiffs failed to prove that Mrs. Pena fell on a damp floor and, thus, failed to meet their burden of proof of an unreasonably dangerous condition. But the record duly supports this factual finding, and therefore, it cannot be manifestly erroneous. Mrs. Pena stated that the employee who accompanied her out of the *992 store admitted that he had just mopped the area where she had fallen. Two Delchamps incident reports documenting a store investigation by manager Lloyd Bise confirmed that the area in which Mrs. Pena fell was in the process of being damp-mopped when the accident occurred.
Defendants also challenge the jury's implicit conclusion that customers were not properly warned that the floor was being damp-mopped. They urge that Mr. Bise's testimony established that the operational procedure of the store was to post warnings and set up cones, notifying customers that the area was wet. Mrs. Pena testified that she did not see any warnings and did not notice any mops or buckets in the vicinity. The record contains no evidence showing that Delchamps's operational policy was actually implemented prior to the fall. The jury obviously relied upon Mrs. Pena's testimony as credible and, therefore, was not manifestly erroneous in concluding that no warnings were in fact posted at the time of her fall and that Delchamps was negligent.
We find no error in the jury's conclusion that the damp floor upon which Mrs. Pena fell presented an unreasonable risk of harm that Delchamps created and that the storeowner failed to exercise reasonable care. The defendants' assignment of error as to the issue of liability has no merit.

COMPARATIVE FAULT
Defendants complain that the jury erred in failing to assess any fault to Mrs. Pena, suggesting that if the store was in the process of damp-mopping the floor as indicated in the accident reports, then the act of mopping should have been obvious to Mrs. Pena. Delchamps did not put forth any evidence to rebut Mrs. Pena's testimony that she did not see any mops or buckets in the area. The jury could have reasonably inferred that Mrs. Pena fell after the floor was mopped and all equipment put away, but prior to the floor drying. Its conclusion that Mrs. Pena was not at fault in causing her fall is not manifestly erroneous. See Laborde v. St. James Place Apartments, 05-0007, p. 5 (La.App. 1st Cir.2/15/06), 928 So.2d 643, 647; Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967, 974 (La.1985).

DAMAGES
The evidence establishes that the morning following the fall in Delchamps, Mrs. Pena consulted her family physician, Dr. James Newcomb. Because her knee symptoms continued to worsen, Mrs. Pena sought medical treatment in June 1998 from Dr. Jorge Sanchez, an orthopedic surgeon who had successfully operated on Mrs. Pena's daughter and grandson in the past. Dr. Sanchez performed an arthroscopy of the knee in August 1998. The arthroscopy revealed that Mrs. Pena had moderate to severe arthritis in the medial compartment of her right knee.
Dr. Sanchez followed up on his post-arthroscopy care of Mrs. Pena and in November 1998 began administering injections. Mrs. Pena responded well to the injections, and in January 1999, Dr. Sanchez noted she was pain-free. He then discharged her from his care but advised her that she should return as needed.
In April 1999, Mrs. Pena returned to Dr. Sanchez, complaining of continued pain in her knee. He treated her with medication, which resulted in a cycle of relief followed by recurrent pain. By October 1999, the oral medications were no longer affording Mrs. Pena any relief, and Dr. Sanchez advised her that a total knee replacement surgery might be necessary. Mrs. Pena declined the surgery recommendation and again received injections in an effort to relieve her symptoms. Mrs. Pena continued conservative care with Dr. Sanchez, who frequently reminded her *993 that knee replacement was indicated. By December 2000, Mrs. Pena decided to undergo the surgery, which Dr. Sanchez performed on January 8, 2001.
Following the total knee replacement surgery, Mrs. Pena developed an infection in the knee, requiring additional hospitalization. Dr. Sanchez referred Mrs. Pena to Dr. Robert Barrack, who surgically removed the areas of infection from the earlier knee replacement surgery and installed an antibiotic cement spacer containing a high concentration of antibiotics. Because the infection had severely damaged Mrs. Pena's tissue in the area, Dr. Jansen, a plastic surgeon, performed a muscle flap procedure soon after, moving nearby tissue to allow wound closure.
In April 2001, Dr. Barrack performed another surgery on Mrs. Pena. Dr. Jansen initiated the procedure, elevating the flap so it would not be damaged, and Dr. Barrack then removed the spacer. Because the tissue in the area continued to show evidence of infection, Dr. Barrack repeated the procedure he had done earlier, replacing the old spacer with a new one, again containing a high dose of antibiotics.
In July 2001, Mrs. Pena's infection had cleared, and Dr. Barrack successfully performed a second knee replacement surgery. By September 2001, Mrs. Pena was recovering with no signs of infection. She experienced numbness, which Dr. Barrack attributed to nerve damage caused by the muscle flap. According to Dr. Barrack, Mrs. Pena has a permanent partial disability. He included her in the population of knee replacement patients who have a higher incidence of pain and stiffness, are more likely to use a cane, and walk with a limp. After the second knee replacement operation, Mrs. Pena suffers from foot drop, a weakness of the muscles that pull the foot up. As a result, when she walks, her foot slaps down.

Special Damages
Plaintiffs presented documentary evidence of medical expenses in the amount of $420,716.08 for Mrs. Pena's treatment following the fall. Defendants assert the jury's award of $420,000.00 in special damages (medical expenses) was clearly wrong. The essence of their challenge is that Mrs. Pena's injury resolved in January 1999 and that consequently they are not responsible for any medical expenses incurred for treatment after that date.
Dr. Sanchez explained to the jury that when he discharged Mrs. Pena, he did not mean to imply that her knee was healthy; she simply was not having any symptoms warranting further treatment at that time. Dr. Sanchez did not conclude that the fall caused the extensive arthritis present in Mrs. Pena's knee. But because Mrs. Pena had experienced no symptoms attributable to arthritis in her knee prior to the fall, Dr. Sanchez opined that the fall in Delchamps aggravated that preexisting condition to the point that it became symptomatic. Mrs. Pena testified several times that before the accident she had no pain in her knee. Mr. Pena testified that he had never heard his wife complain of knee pain prior to the fall in Delchamps. That testimony was corroborated by the absence of any documented complaints of knee pain in Dr. Newcomb's records, despite Mrs. Pena's long relationship with that family physician.
Dr. Terry Habig, an orthopedic surgeon, examined Mrs. Pena at defendants' request. He admitted that if Mrs. Pena was asymptomatic before May 28, 1998, it was his opinion that the fall aggravated the preexisting condition of her knee to the point where she needed to have the arthroscopy. He further admitted that in such event, the fall caused Mrs. Pena to become symptomatic and, more probably *994 than not, her symptoms through the first knee replacement surgery were one continuous manifestation created by the fall. Dr. Habig explained to the jury that Mrs. Pena's need for knee replacement surgery was due to a combination of arthritis present in the knee before the fall and the aggravation caused by the fall.
David Aiken, M.D., another orthopedic surgeon, conducted an expert evaluation of Mrs. Pena's history, condition, and treatment at defendants' request. Although he did not conduct a physical examination of Mrs. Pena, he reviewed her medical records and concluded that after the initial arthroscopy, when Dr. Sanchez indicated that she was discharged because she was pain-free, Mrs. Pena had recovered from the accident-related trauma. Dr. Aiken explained to the jury that he did not believe it was possible for a person with the degree of pre-existing arthritis Mrs. Pena had in her knee prior to the fall to have been asymptomatic.
In a personal injury suit, the plaintiff bears the burden of proving a causal relationship between the accident and the injuries complained of. American Motorist Ins. Co. v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991). A defendant takes the plaintiff as he finds him and is responsible for all natural and probable consequences of his tortious conduct. When the defendant's negligent action aggravates a preexisting injury or condition, he must compensate the victim for the full extent of that aggravation. Perniciaro v. Brinch, 384 So.2d 392, 395 (La.1980). Whether the accident caused the plaintiff's injuries is a factual question that should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973, 979 (La.1991).
The jury was presented with two versions of the facts and chose to believe Mrs. Pena when she stated that she did not experience any right knee pain prior to the fall in Delchamps. This credibility decision was the jury's to make, and it is not manifestly erroneous. The testimony of Drs. Sanchez and Habig supported a finding that Mrs. Pena's symptoms were one continuous manifestation as a result of the fall. The jury's award of medical expenses, duly supported by the record, is not manifestly erroneous.

General Damages
"General damages" involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle that cannot be measured definitively in terms of money. Boudreaux v. Farmer, 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1373, 1374 (La.1992). The primary objective of general damages is to restore the party in as near a fashion as possible to the state he was in at the time immediately preceding injury. Daigle v. U.S. Fidelity and Guar. Ins. Co., 94-0304, p. 7 (La.App. 1st Cir.5/5/95), 655 So.2d 431, 437. The factors to be considered in assessing quantum of damages for pain and suffering are severity and duration. Thibodeaux v. USAA Cas. Ins. Co., 93-2238, p. 8 (La.App. 1st Cir.11/10/94), 647 So.2d 351, 357. In Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), the Louisiana Supreme Court noted:
[T]he discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular *995 circumstances that the appellate court should increase or reduce the award.
For the same reasons upon which they base their challenge of the special damages award, defendants complain that the jury abused its discretion awarding $200,000.00 to Mrs. Pena in general damages. Their primary contention is that after January 8, 1999, she was no longer suffering from the effects attributable to her fall. We have concluded the record contains medical testimony to support the finding that Mrs. Pena's symptoms before and after Dr. Sanchez's initial discharge were one continuous manifestation caused by the fall. Further, as we have previously observed, the jury unequivocally concluded that virtually all of the documented medical expenses for treatment of Mrs. Pena's condition, including all surgical and hospital expenses, were caused by the fall and resulting injury.
Pointing to the five surgeries Mrs. Pena underwent, the serious risk of death she faced as a result of the post-surgery infection, the major change in her lifestyle to a less active one, and her residual physical disability or impairment, including the foot drop condition, the Penas urge that the jury's general damages award was abusively low and that the award should be increased to at least $400,000.00. We agree that the jury abused its discretion in its award.
All of the physicians who examined Mrs. Pena agreed that she had preexisting arthritis in her knee. But again, a defendant takes his victim as he finds him, and he is responsible for all the natural and probable consequences of his tortious conduct. The preponderance of the evidence in the record demonstrates that the fall at issue precipitated the onset of Mrs. Pena's symptoms, and that all of the medical treatment and its sequelae were legally caused by the fall.
We find that the jury abused its discretion in its general damage award considering the "particular injuries and their effects under the particular circumstances" of the case. Mrs. Pena not only underwent two extensive knee replacement procedures on the right knee, in addition to other surgeries, requiring 87 days of total hospitalization, but is also unfortunately left with a disabling foot drop condition that is likely permanent in nature. We find an appropriate award of general damages for Mrs. Pena's pain and suffering to be $250,000.00, the lowest amount reasonably within the jury's discretion for the particular injuries proven to have been sustained by this particular plaintiff. See Youn, 623 So.2d at 1261.

Loss of Consortium
Loss of consortium includes such pecuniary elements as loss of services and such nonpecuniary components as loss of love, companionship, affection, society, sexual relations, comfort, and solace. See Emery v. Owens-Corporation, 00-2144, p. 20 (La.App. 1st Cir.11/9/01), 813 So.2d 441, 456, writ denied, 02-0635 (La.5/10/02), 815 So.2d 842.
Mr. Pena asserts the jury erred in failing to award him any damages for loss of consortium. Trial testimony indicated that after his wife's fall, Mr. Pena had to undertake additional housework, took time off from work for twelve weeks, helped care for Mrs. Pena's surgical wound and infection after the first knee replacement surgery, was unable to engage in intimate relations with his wife, and could no longer enjoy her company in their former joint activities of walking, biking, dancing, and parading.
Determining the amount or "quantum" of damages is a fact determination for the jury and is "entitled to great deference on review." Trunk v. Med. Ctr. of La. at New Orleans, 04-0181, p. 9 *996 (La.10/19/04); 885 So.2d 534, 539, citing Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00); 774 So.2d 70, 74. In the latter case, the supreme court established an "abuse of discretion" standard of review for claimed inconsistencies in damage awards. The supreme court held that there is no "bright line rule" that an award of special damages without corresponding general damages constitutes legal error. Id., 00-0492 at p. 9, 774 So.2d at 76. The Wainwright decision did not, however, go so far as to expressly abrogate the long-standing line of jurisprudence that it is legal error to award special damages for a personal injury, yet simultaneously refuse to award general damages for injuries with objective symptoms or findings. Nor did Wainwright address the situation present in the jury's verdict as to which Mr. Pena complains: a clearly wrong factual finding of no damages and the refusal to grant an award of damages that is inconsistent with the evidence. Such a situation would not constitute an abuse of discretion in the award of damages; rather, it would constitute manifest error in the predicate factual determination of the existence of damages.
Therefore, we are required to examine the trial testimony and evidence to discern whether the jury committed manifest error by declining to award Mr. Pena any damages for loss of consortium. Considering the particular facts and circumstances of this case, including the uncontradicted testimony of Mr. and Mrs. Pena, we must conclude that the jury committed manifest error in finding that Mr. Pena did not sustain a compensable loss of consortium. Based upon our review of the evidence, we award damages de novo for Mr. Pena's loss of consortium in the sum of $25,000.00.

DECREE
In conclusion, the plaintiffs-appellees' motion to dismiss the appeal of the defendant-appellant, National Union Fire Insurance Company of Pittsburgh, PA., is denied. The trial court's judgment rendered in conformity with the jury's verdict is reversed in part to award the plaintiff-appellant, Frank Pena, the sum of $25,000.00, amended in part to increase the award of general damages to the plaintiff-appellant, Laverne Pena, to $250,000.00, and affirmed in all other respects. The costs of this appeal are assessed to the defendants-appellants, Delchamps, Inc. and National Union Fire Insurance Company of Pittsburgh, PA.
MOTION TO DISMISS DENIED; REVERSED IN PART; AMENDED IN PART; AND AFFIRMED IN PART.
KUHN, J., dissents and assigns reasons.
KUHN, J., dissenting.
I disagree with the majority's modifications of the trial court's judgment, which incorporated the jury's award of $200,000 in general damages to Mrs. Pena and its conclusion that Mr. Pena was not entitled to any loss of consortium damages. Appellate courts should not substitute their conclusions for those made by the trier of fact.
As the majority correctly notes, all the doctors who examined Mrs. Pena agreed that she had preexisting arthritis in her knee but it fails to mention that they also agreed that, even without the fall, she would eventually develop knee problems, which would limit her activities and cause her to have pain. These doctors also indicated that, depending on how old she was at the onset of the debilitating pain, treatment would vary: the younger she was when her knee became symptomatic, the more likely knee replacement surgery was indicated. Therefore, the medical testimony supports a finding that Mrs. Pena's pain and suffering was of limited duration since, even if she had not fallen in Delchamps, future knee problems were inevitable. *997 Therefore, I do not see any abuse of discretion by the jury in its award of $200,000 to Mrs. Pena for her general damages. And given this medical testimony, the jury certainly was within its province to infer that at some point in their lives, Mr. Pena would have to bear consortium losses due to the preexisting arthritic condition of Mrs. Pena's knee. Thus, I believe the jury did not abuse its discretion in its determination that Mr. Pena was not entitled to loss of consortium damages.
For these reasons, I would affirm the trial court's judgment, incorporating the jury's verdict. Accordingly, I dissent.
NOTES
[1] Since a notice of abandonment was neither sought by plaintiffs nor issued by the clerk of this court, plaintiffs' motion to dismiss the appeal of National Union Fire Insurance Company of Pittsburgh, PA, based on its brief being untimely, is denied. Uniform Rules of the Louisiana Courts of Appeal, Rule 2-8.6. See Keating v. Cambre, 420 So.2d 1355 (La. App. 5th Cir.1982), writ denied, 446 So.2d 1222 (La.1984).